IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH FACEBOOK USER ID 100043710434560 THAT IS STORED AT PREMISES CONTROLLED BY FACEBOOK | Case No. 5:20mj1213<br><br>**Filed Under Seal** |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, JOHN S. CHRISTIE JR., a Task Force Officer (TFO) of the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), United States Department of Justice, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of an application for a search warrant for information associated with a certain Facebook user ID that is stored at premises owned, maintained, controlled, or operated by Facebook, Inc. ("Facebook"), a social networking company headquartered in Menlo Park, California. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Facebook to disclose to the government records and other information in its possession, further described in Section I of Attachment B, pertaining to the subscriber or customer associated with the user ID. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the information described in Section II of Attachment B, using the procedures described in Section III of Attachment B.

2.      I am a law enforcement officer of the United States, and under 18 U.S.C. § 3051, I am charged by the Attorney General with the duty of enforcing any of the criminal, seizure, or forfeiture provisions of the laws of the United States, may carry firearms, serve warrants and subpoenas issued under the authority of the United States, make arrests without warrant for any offense against the United States committed in my presence, or for any felony under the laws of the United States if there are reasonable grounds to believe that the person to be arrested has committed or is committing such felony.

3.      I have been employed by the Ohio Adult Parole Authority (APA) as a Parole Officer since March 2016 and since May 2017 I have been serving as a TFO with the ATF.  I am presently assigned to the APA's Akron Region and to ATF's Cleveland Field Office.

4.      I am a graduate of New Employee Orientation at the State of Ohio Department of Rehabilitation and Corrections Training Academy, located in Orient, Ohio, as well as Basic Probation Officer Training, through the Georgia Department of Corrections in Forsyth, Georgia. I have also completed an ATF Joint Law Enforcement Operations (JLEO) TFO program in Washington DC. During these training academies, I learned about the supervision of felony offenders as well as conducting investigations, interviews, execution of arrest warrants, and criminal procedure.

5.      I was previously employed as a Probation Officer with the Georgia Department of Corrections from September 2011 to May 2015. During that time, I both led and assisted with numerous drug and gang investigations that involved identifying criminal activity, application of various investigative techniques, conducting searches, as well as obtaining and executing arrest warrants.  I received a Bachelor's Degree in Sociology with a concentration in Criminal Justice from St. John Fisher College in Rochester, NY.  I have completed numerous specialized training

courses through organizations such as the Atlanta – Carolinas High Intensity Drug Trafficking Area (HIDTA) and the Georgia Public Safety Training Center, including courses on interview and interrogations, search warrants and affidavits, gang investigations, advanced gang investigation and prosecution techniques, cyber-crime investigations, financial crime investigations, and money laundering investigations.

6. As an ATF Task Force Officer, I have conducted and/or assisted in numerous investigations involving the possession, distribution, and trafficking of controlled substances, in violation of State and Federal laws. These drug investigations have involved searching persons, electronic devices, social media, residences, and vehicles, for contraband, using both search warrants and consent waivers. During these searches, I have gained experience in identifying controlled substances. I have also gained experience with other contraband commonly associated with illegal drug activity including, cutting agents, narcotics packaging material, drug paraphernalia, counterfeit currency, and other items used in the sale and distribution of controlled substances. I have also gained knowledge that those involved in the distribution of narcotics often utilize electronic devices, such as cellular phones, and social media websites/applications to communicate with their customers and suppliers.

7. As an ATF Task Force Officer, I have conducted and/or assisted in numerous investigations involving the possession and trafficking of firearms in violation of State and Federal laws, as well as the use of firearms in furtherance of other criminal offenses.  In conducting these investigations, I have utilized a variety of investigative techniques and resources, including but not limited to surveillance, confidential informants, controlled purchases, trash pulls, social media research, electronic databases and interviews. During these investigations, I have learned that firearms are often acquired through third parties, due to the

3

subjects of investigation being prohibited from legally purchasing firearms. Like drug distribution and trafficking, individuals engaged in illegal firearms trafficking utilize electronic devices, such as cellular phones, and social media websites/applications to communicate with their customers and suppliers.

8. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

9. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that a violation of 18 U.S.C. § 922(g)(1), Felon in Possession of a Firearm has been committed by Antwan WATSON. There is also probable cause to search the information described in Attachment A for evidence of these crimes and contraband or fruits of these crimes, as described in Attachment B.

**PROBABLE CAUSE**

10. On or about December 1, 2016, WATSON pled guilty in Summit County, Ohio, Court of Common Pleas case CR-2016-02-0466-A to the offense of Trafficking in Heroin, a felony of the 2nd degree. Subsequently, on January 17, 2017, WATSON was sentenced and committed to the Ohio Department of Rehabilitation and Correction for a definite term of 3 years, followed by 3 years of supervision on Post Release Control (PRC) by the Ohio Adult Parole Authority (APA). Based on this conviction, WATSON is prohibited by federal law from possessing firearms and ammunition.

11. On May 6, 2020, APA Parole Officer (PO) Daniel Robinson received information from a Confidential Informant (CI-1) regarding WATSON. CI-1 stated that WATSON was in

possession of a firearm and a large amount of currency. CI-1 also believed that WATSON had been involved in a shooting in Akron, Ohio. CI-1 provided PO Robinson with a video, which is believed to have been posted to Facebook on or about May 3, 2020, under the user name "Twan Twan." After reviewing the video, PO Robinson, who supervises WATSON during his duties as an APA PO, identified the subject portrayed in the video as WATSON. During the video, WATSON was observed brandishing what appeared to be a Glock pistol with a weapon mounted light attachment.

12. Later on May 6, 2020, PO Robinson informed me that he had received information that WATSON was believed to be in possession of a firearm. PO Robinson stated that WATSON resided at 1328 Weathervane Lane, Apartment 1C, Akron, Ohio 44313, with his father, John HARRIS. PO Robinson also informed me that WATSON was in violation of his PRC conditions and would need to be taken into custody. I then conducted surveillance in the area of 1328 Weathervane Lane. At approximately 3:36 PM, I observed a white Nissan Rogue bearing Maryland license plate 9DW9812, parked on the east side of the building near the entrance leading to apartment 1C. This vehicle was later determined to be an Enterprise rental vehicle.

13. According to APA supervision records of WATSON, Parole Officers previously visited WATSON at 1328 Weathervane Lane, Apartment 1C, Akron, Ohio 44313 in February 2020. A review of the Ohio Law Enforcement Gateway (OHLEG) showed that WATSON's driver's license address is also 1328 Weathervane Lane, Apartment 1C, Akron, Ohio 44313.

14. On May 8, 2020, PO Robinson and PO Scott Scislo attempted to contact another subject on PRC, Daeric BENFORD at BENFORD's residence, 895 Johnston Street, Akron, Ohio 44306. Parole Officers were unsuccessful at contacting BENFORD at that residence. I was in the

area of Johnston Street and stopped to speak with PO Robinson and PO Scislo in a parking lot just to the east of BENFORD's residence.

15. Soon after parking, at approximately 10:55 AM, PO Robinson, PO Scislo, and I observed a white Nissan Rogue arrive in the driveway of 895 Johnston Street. WATSON then exited the vehicle and entered the residence. I drove by the residence and confirmed that it was the same white Nissan Rogue bearing Maryland license plate 9DW9812 that I observed outside WATSON's residence on May 6, 2020. Once it was determined that WATSON would be taken into custody for violation of his PRC, additional Parole Officers and Summit County Sheriff's Office (SCSO) Detective William McKinney arrived in the area to assist.

16. When WATSON exited the residence, Parole Officers attempted to take him into custody but he ran back into the residence. A perimeter was established and PO Robinson knocked on the front door. Eric BENFORD came to the door and met with officers on the porch. WATSON then exited the residence and was taken into custody.

17. Eric BENFORD allowed PO Frank Yurich, PO Michael Jones, Detective McKinney, and I into the residence. Once inside, officers discovered that there were also two juvenile males in the residence. I explained to Eric BENFORD that APA believed that WATSON was in possession of a firearm. Eric BENFORD provided verbal consent to search the residence. During the search, PO Yurich located United States currency inside a closet. This closet was located on the first floor near the front door at the base of the stairs.

18. PO Scislo, who is also a TFO with the United States Secret Service (USSS), reviewed the currency located by PO Yurich and determined that four bills appeared to be counterfeit. When Eric BENFORD was asked who the money in the closet belonged to, he claimed that is was his.

19. I then located keys to the Nissan Rogue in the pocket of the sweatshirt which WATSON was observed wearing then he entered the residence. The sweatshirt was sitting on the couch just inside of the front door. PO Jake Nees searched the vehicle and located a single dose of Narcan nasal spray, as well as a set of keys.

20. Parole Officers then transported WATSON to his residence, 1328 Weathervane Lane, Apartment 1C, Akron, Ohio 44313 and arrived there at approximately 12:15 PM. Upon arrival, parole officers attempted to make entry into apartment 1C using the keys obtained from the Nissan Rogue, but were unsuccessful. PO James Koss determined that HARRIS worked on site at the apartment complex and went to the leasing office to speak with him.

21. HARRIS arrived at the apartment at approximately 12:20 PM. Parole Officers and I explained to HARRIS that APA wished to search the residence. HARRIS stated that he believed no one was in the residence and that he had the key. HARRIS explained to officers that his bedroom was the first bedroom on the left and WATSON's was the second on the left. HARRIS stated that he kept a lock on his bedroom door and offered to unlock his bedroom door for officers. HARRIS provided verbal consent to search the residence and used his key to unlock the apartment door.

22. Once inside the residence, Parole Officers conducted a security sweep. During the sweep, a torn half of a clear plastic sandwich bag was observed in plain view on the kitchen floor. Based on my training and experience, I know that controlled substances are often packaged in sandwich bags. The bag is then knotted and the portion of the bag containing the controlled substance is torn off.

23. Parole Officers then conducted a search of the apartment. During the search, PO Jones located a Glock Model 19 Generation 5, 9mm caliber pistol, bearing serial number

BFKF495 with a Streamlight TLR-6 light attachment in a bar across from WATSON's bedroom. PO Yurich located a Winchester box containing 40 rounds of .45 caliber ammunition in the closet next to the bar. On a table next to the bar, PO Nees located court documents addressed to WATSON. I assisted PO Jones with securing the pistol. It was found to be loaded with a round in the chamber and ammunition in the magazine. The pistol was preserved for touch DNA testing.

24. Following the discovery of the pistol in WATSON's residence, I interviewed HARRIS outside of the apartment. HARRIS estimated that he had last seen WATSON at the apartment five days prior. I then asked HARRIS if WATSON had a key to the apartment. HARRIS stated that he does not but said he sometimes leaves his key outside of his apartment door for WATSON to use. HARRIS indicated that there is only one key to the apartment. HARRIS stated that he allows WATSON to use the key in circumstances such as when HARRIS stays at his mother of child's residence. HARRIS then stated, "He been swinging my f---in' door."

25. I asked HARRIS if he owned any firearms. HARRIS indicated that he did not. I then asked HARRIS if there were any firearms in the apartment. HARRIS replied, "Not that I know of…I don't own no firearm." I then asked HARRIS if he ever purchased a firearm. HARRIS denied ever purchasing a firearm. HARRIS indicated that he had a prior conviction for Drug Abuse. I informed HARRIS that a firearm had been found in the residence. HARRIS again stated that he did not own any firearms.

26. PO Scislo asked HARRIS if anyone else had access to the apartment besides himself and WATSON. HARRIS indicated that his children are grown up and there had been a

8

falling out. HARRIS stated that they had not recently been coming over. PO Scislo then confirmed with HARRIS that recently only HARRIS and WATSON had been at the apartment.

27. I informed HARRIS that the firearm was hidden in the bar across from WATSON's bedroom. HARRIS appeared surprised and reiterated that he had no knowledge of the firearm. HARRIS then became agitated and stated, "Like he tried to hide the f---ing gun right in my house. That's bulls--t." PO Scislo then showed HARRIS a photograph of the firearm hidden in the bar. HARRIS again said that he did not own any guns. HARRIS stated that WATSON had been staying with him "off and on" since his release from prison approximately three months prior.

28. After concluding the interview with HARRIS, I conducted an interview of WATSON, who was seated in an APA transport van. At the onset of the interview, I advised WATSON of his Miranda Rights by reading from a printed Miranda Warning card. WATSON indicated he understood his rights and began speaking with law enforcement. I advised WATSON that APA had received information that he was in possession of a firearm. PO Robinson then showed WATSON the Facebook Live Video that was provided by CI-1.

29. I then told WATSON that a firearm was located in his residence and asked WATSON how long he had it for. WATSON stated, "What's the difference if you found the gun...I'm going to jail anyways, right?"

30. I then discussed with WATSON his prior felony convictions and how he could be charged for illegally possessing a firearm. I advised WATSON that he would be facing a parole violation initially, then he would be facing criminal charges for possessing the firearm.

31. WATSON stated that he has been out of prison for four months. WATSON confirmed that he had been paroled to his father's apartment, 1328 Weathervane Lane,

9

Apartment 1C, Akron, Ohio 44313, for those four months. WATSON then confirmed that he had a bedroom with his clothing inside of the apartment. At the conclusion of the interview, WATSON proclaimed, "I don't work with the cops man!"

32. At the conclusion of the interviews and search, PO Robinson provided me with the video that he had previously received from CI-1. I reviewed the video, which appeared to be a Facebook Live video. A Facebook Live Video is a live streamed video that users can post to their page. After the live stream stops, the video remains on the user's page. In the video, the user name "Twan Twan" was observed at the top of the screen. WATSON appeared in the video sitting in a vehicle counting United States currency. WATSON then picked up what appeared to be a Glock pistol with a light attachment from the area of the center console. WATSON displayed the pistol and stated, "You know it stay with me though." The pistol displayed in the video appeared to be the same type of Glock pistol with a TLR-6 light attachment as the pistol located in WATSON's residence. PO Robinson then provided me with a digital copy of the video.

33. Later on that date, I reviewed the Facebook page believed to belong to WATSON (Facebook ID: 100043710434560). The name on the page was displayed as "Twan Twan" and the page had multiple photographs of WATSON. I also located photographs on the page that were taken inside of 1328 Weathervane Lane, Apartment 1C, Akron, Ohio 44313, including one photograph of WATSON sitting on the couch near the bar where the pistol was located. I then reviewed two videos from December 2019, which were located on the page. In the videos, WATSON was observed sitting at the bar where the pistol was located. I then submitted a preservation request to Facebook in order to preserve the contents of page.

34. On May 15, 2020, I submitted the Glock Model 19 pistol bearing serial number BFKF495 and a single magazine containing ammunition which was located in WATSON's residence on May 8, 2020, to the Ohio Bureau of Criminal Investigations (BCI) for Touch DNA testing.

35. On June 5, 2020, BCI issued BCI Laboratory Report Number 20-33927, which reported that BCI was able to obtain a male DNA profile sufficient for comparison from a swab of the grip of the Glock Model 19 pistol bearing serial number BFKF495. Investigators are applying for a search warrant to obtain a DNA standard from WATSON for comparison to the profile found on the firearm.

36. On July 2, 2020, ATF Special Agent (SA) John Laurito, an ATF Firearms Interstate Nexus expert, made a determination as to the origin of the seized firearm referenced in this Affidavit (Glock Model 19 pistol bearing serial number BFKF495). SA Laurito determined the seized firearm was manufactured in the Republic of Austria and that the firearm had traveled in interstate and/or foreign commerce.

37. Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com.  Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

38. Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter.  This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers (for password retrieval), physical address (including city, state,

and zip code), telephone numbers, screen names, websites, and other personal identifiers. Facebook also assigns a user identification number to each account. Facebook identifies unique Facebook accounts by a user's email address, the user ID number, or the username associated with a Facebook profile.

39. Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Facebook assigns a group identification number to each group. A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

40. Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

41. Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming

"events," such as social occasions, by listing the event's time, location, host, and guest list.  In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times.  A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

42. Facebook allows users to upload photos and videos, which may include any metadata such as a location that the user transmitted when s/he uploaded the photo or video.  It also provides users the ability to "tag" (*i.e.*, label) other Facebook users in a photo or video.  When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video.  For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

43. Facebook users can exchange private messages on Facebook with other users.  These messages, which are similar to e-mail messages, are sent to the recipient's "Inbox" on Facebook, which also stores copies of messages sent by the recipient, as well as other information.  Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile.  In addition, Facebook has a Chat feature that allows users to send and receive instant messages through Facebook.  These chat communications are stored in the chat history for the account.  Facebook also has a Video Calling feature, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

13

44. If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

45. Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

46. Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

47. Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

48. Facebook Notes is a blogging feature available to Facebook users, and it enables users to write and post notes or personal web logs ("blogs"), or to import their blogs from other services, such as Xanga, LiveJournal, and Blogger.

49. The Facebook Gifts feature allows users to send virtual "gifts" to their friends that appear as icons on the recipient's profile page. Gifts cost money to purchase, and a personalized message can be attached to each gift. Facebook users can also send each other "pokes," which are free and simply result in a notification to the recipient that he or she has been "poked" by the sender.

50. Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

51. In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

52. Facebook uses the term "Neoprint" to describe an expanded view of a given user profile. The "Neoprint" for a given user can include the following information from the user's profile: profile contact information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications.

53. Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

54. Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical

15

problems, billing inquiries, or complaints from other users. Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

55. As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. From my training, experience, and investigation, I know that a Facebook user's "Neoprint," IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Facebook logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, Facebook builds geo-location into some of its services. Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to

locate each other.  This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner.  Finally, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation.  For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

56. Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

## **INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED**

57. I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Facebook to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B, using the procedures described in Section III of Attachment B.

## **CONCLUSION**

58. Based on the foregoing, I request that the Court issue the proposed search warrant.

59. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court is a district court of the United States . . . that – has jurisdiction over the offense being investigated. 18 U.S.C. § 2711(3)(A)(i). Acts or omissions in furtherance of the offenses under investigation occurred within the Northern District of Ohio.

60. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

61. Because the warrant will be served on Facebook who will then compile the requested records and information at a time convenient to it, there exists reasonable cause to permit the execution of the requested warrant at any time in the day or night.

Respectfully submitted,

_____
John S. Christie Jr.
Task Force Officer
Bureau of Alcohol, Tobacco, Firearms and Explosives

Sworn to via telephone after submission by reliable electronic means. Crim.Rules. 4.1; 41(d)(3). this 17th day of July, 2020.



Kathleen B. Burke, U.S. Magistrate Judge